**Ronald H. Severaid (SBN 078923)**
**Carter Glahn (SBN 242378)**
SEVERAID & GLAHN, PC
1787 Tribute Road, Suite D
Sacramento, CA 95815
Telephone: (916) 929-8383
Fax: (916) 925-4763
Email: rhseveraid@sbcglobal.net
    cglahn@sbcglobal.net

Attorneys for Plaintiffs

FILED

2012 AUG 27 PM 4: 51

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:

# UNTITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

THE ORIGINAL TALK RADIO NETWORK, INC., an Oregon corporation; TALK RADIO NETWORK ENTERPRISES, LLC, an Oregon limited liability company; and TALK RADIO NETWORK-FM, INC., a Delaware corporation,

              Plaintiffs,

    v.

DIAL GLOBAL, INC., a Delaware corporation formerly known as WESTWOOD ONE, INC.; DIAL COMMUNICATIONS – GLOBAL MEDIA, INC, a Delaware corporation; DIAL COMMUNICATIONS GLOBAL MEDIA, LLC, a Delaware limited liability company; EXCELSIOR RADIO NETWORKS, LLC, a Delaware limited liability company doing business as TRITON RADIO NETWORKS; TRITON MEDIA GROUP, LLC, a California limited liability company; TRITON MEDIA, LLC, a California limited liability company; OAKTREE CAPITAL MANAGEMENT, LP, a Delaware limited partnership; VERGE MEDIA COMPANIES, INC., a Delaware corporation; VERGE MEDIA COMPANIES, LLC, a Delaware limited liability company formerly known as RADIO NETWORK HOLDINGS, LLC.; COURTSIDE, LLC, a Delaware limited liability company; COURTSIDE ENTERTAINMENT GROUP; COMPASS MEDIA NETWORKS, LLC; COMPASS MEDIA MARKETING; WYD MEDIA MANAGEMENT, LLC; WYM MEDIA MANAGEMENT, LLC; SPENCER L. BROWN; KEN WILLIAMS; DAVID LANDAU; NORMAN J. PATTIZ, PETER KOSANN and RON HARTENBAUM,

              Defendants,

Case No.


**CV12-7370** JFW (VLAX)

**COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT AND THE CARTWRIGHT ACT, AND FOR FRAUDULENT INDUCEMENT, INTERFERENCE WITH CONTRACT AND INTERFERENCE WITH PROSPECTIVE ADVANTAGE**

**JURY TRIAL DEMANDED**

1

Plaintiffs THE ORIGINAL TALK RADIO NETWORK, INC., an Oregon corporation ("**OTRN**"), TALK RADIO NETWORK ENTERPRISES, LLC, an Oregon limited liability company ("**TRNE**") and TALK RADIO NETWORK-FM, INC., a Delaware corporation ("**TRN-FM**") hereby bring the above–captioned action (this "**Action**") against the defendants in this Action (individually, "**Defendant**" and, plural or collectively, "**Defendants**"), for multiple violations of the laws of the United States, as well as multiple state law claims, as hereinafter alleged. OTRN, TRNE and TRN-FM (collectively, "**Plaintiffs**") hereby demand a trial by jury, and allege as follows:

**PARTIES**

1.      OTRN is a corporation which was duly organized in 1993, and is duly existing, under the laws of the State of Oregon ("**Oregon**"), with its principal place of business in Oregon.

2.      OTRN produces and syndicates various spoken word programs, including without limitation The Michael Savage Show, a three hour daily (Monday through Friday) talk radio program which is rated by Talkers Magazine, an industry trade publication, as the 3rd largest radio talk show in the United States.

3.      TRNE is a limited liability company which was duly organized in 2003, and is duly existing, under the laws of Oregon, with its principal place of business in Oregon.

4.      TRNE produces and syndicates various spoken word programs, including without limitation The Laura Ingraham Show, a three hour daily (Monday through Friday) talk radio program which is rated by Talkers as the 5th largest radio talk show in the United States, and The Jerry Doyle Show, a three hour daily (Monday through Friday) talk radio program which is rated by Talkers as the 6th largest radio talk show in the United States.

5.      TRN-FM is a corporation which was duly organized in 2004, and is duly existing, under the laws of the State of Delaware ("**Delaware**"), with its principal place of business in Oregon.

6.      TRN-FM syndicates The Mancow Experience, a three hour daily (Monday through Friday) spoken word talk radio program, and The Phil Hendrie Show, a three hour daily (Monday through Friday) spoken word talk radio program.

7.      Plaintiffs are informed and believe, and on that basis allege, that defendant DIAL GLOBAL, INC. ("**Dial Global**") is a corporation organized and existing under the laws of the State of

Delaware ("**Delaware**"), with its principal place of business in the State of New York ("**New York**"), which was formerly known by the name WESTWOOD ONE, INC. ("**Westwood**").

8.     Plaintiffs are informed and believe, and on that basis allege, that Dial Global maintains offices, and conducts business, in the County of Los Angeles ("**Los Angeles**"), in the State of California ("**California**").

9.     Plaintiffs are informed and believe, and on that basis allege, that defendant DIAL COMMUNICATIONS - GLOBAL MEDIA, INC ("**Dial Communications**") is, or previously was, a corporation organized and existing under the laws of Delaware, with its principal place of business in New York, and that Dial has maintained offices, and done business, in Los Angeles, California.

10.     Plaintiffs are informed and believe, and on that basis allege, that Dial Communications is the successor in interest to Dial Communications Group, LLC, a New York limited liability company ("**Dial I**").

11.     Plaintiffs are informed and believe, and on that basis allege, that defendant DIAL COMMUNICATIONS GLOBAL MEDIA, LLC ("**Dial, LLC**") is, or previously was, a limited liability company organized and existing under the laws of Delaware, with its principal place of business in Los Angeles, California.

12.     Plaintiffs are informed and believe, and on that basis allege, that defendant EXCELSIOR RADIO NETWORKS, LLC ("**Excelsior**") is a limited liability company organized and existing under the laws of Delaware, doing business as TRITON RADIO NETWORKS, with its principal place of business in New York, and which conducts business in Los Angeles, California.

13.     Plaintiffs are informed and believe, and on that basis allege, that Excelsior owns and/or controls Dial Communications and/or Dial, LLC.

14.     Plaintiffs are informed and believe, and on that basis allege, that defendant TRITON MEDIA GROUP, LLC ("**Triton Group**") is a limited liability company organized and existing under the laws of California, with its principal place of business in Los Angeles, California.

15.     Plaintiffs are informed and believe, and on that basis allege, that defendant TRITON MEDIA, LLC ("**Triton Media**") is a limited liability company organized and existing under the laws of California, with its principal place of business in Los Angeles, California.

16.     Plaintiffs are informed and believe, and on that basis allege, that defendant OAKTREE CAPITAL MANAGEMENT, LP ("**Oaktree**") is a limited partnership organized and existing under the laws of Delaware, with its principal place of business in Los Angeles, California.

17.     Plaintiffs are informed and believe, and on that basis allege, that Oaktree owns and/or controls Triton Group and/or Triton Media.

18.     Plaintiffs are informed and believe, and on that basis allege, that defendant VERGE MEDIA COMPANIES, INC. ("**Verge, Inc.**") was, at various times relevant herein, a corporation organized and existing under the laws of Delaware, with its principal place of business in Los Angeles, California.

19.     Plaintiffs are informed and believe, and on that basis allege, that defendant VERGE MEDIA COMPANIES, LLC ("**Verge, LLC**"), is a limited liability company organized and existing under the laws of Delaware, which was formerly known as RADIO NETWORK HOLDINGS, LLC ("**RNH**"), and is a wholly owned subsidiary of Dial Global.

20.     Plaintiffs are informed and believe, and on that basis allege, that Verge, Inc. was merged with and into RNH (the "**Westwood Merger**"), after which RNH changed its name to Verge, LLC and Westwood changed its name to Dial Global.

21.     Plaintiffs are informed and believe, and on that basis allege, that Verge, Inc. was owned and/or controlled by Excelsior and/or Triton Group.

22.     Plaintiffs are informed and believe, and on that basis allege, that Excelsior is owned and/or controlled by Triton Group.

23.     Plaintiffs are informed and believe, and on that basis allege, that, upon the Westwood Merger, Triton Group became the majority shareholder of Dial Global, then known as Westwood, and thus holds a controlling interest in Dial Global.

24.     Plaintiffs are informed and believe, and on that basis allege, that Triton Group is in turn managed and controlled by Oaktree, such that Oaktree controls Dial Global.

25.     Plaintiffs are informed and believe, and on that basis allege, that defendant COURTSIDE, LLC ("**Courtside**") is a limited liability company organized and existing under the laws of Delaware, with its principal place of business in Los Angeles, California.

26.     Plaintiffs are informed and believe, and on that basis allege, that defendant COURTSIDE ENTERTAINMENT GROUP ("**Courtside Entertainment**") is a business entity which is organized and existing under the laws of one or more states within the United States other than Oregon, including without limitation California, Delaware and/or New York, and either maintains its principal place of business or offices in, or is subject to direction and control from offices, officers, principals, directors, managers, partners and/or other executives and/or management personnel located within, Los Angeles,

4

California, whether directly or indirectly through management and ownership chains, or otherwise actively engages in business within Los Angeles, California.

27.     Plaintiffs are informed and believe, and on that basis allege, that defendants COMPASS MEDIA NETWORKS, LLC ("**Compass Media**") and COMPASS MEDIA MARKETING ("**Compass Marketing**") are business entities which are organized and existing under the laws of one or more states within the United States other than Oregon, including without limitation California, Delaware and/or New York, and either maintain their principal place of business or offices in, or are subject to direction and control from offices, officers, principals, directors, managers, partners and/or other executives and/or management personnel located within, Los Angeles, California, whether directly or indirectly through management and ownership chains, or otherwise actively engage in business within Los Angeles, California.

28.     Plaintiffs are informed and believe, and on that basis allege, that defendants WYD MEDIA MANAGEMENT, LLC ("**WYD**") and WYM MEDIA MANAGEMENT, LLC ("**WYM**") are business entities which are organized and existing under the laws of one or more states within the United States other than Oregon, including without limitation California, Delaware, New York and/or the State of Connecticut, and either maintain their principal place of business or offices in, or are subject to direction and control from offices, officers, principals, directors, managers, partners and/or other executives and/or management personnel located within, Los Angeles, California, whether directly or indirectly through management and ownership chains, or otherwise actively engage in business within Los Angeles, California.

29.     Plaintiffs are informed and believe, and on that basis allege, that defendant SPENCER L. BROWN ("**Brown**") is an adult individual, and is a co-chief executive officer of one or more Defendants, including without limitation Dial Global, and is a director of Dial Global.

30.     Plaintiffs are informed and believe, and on that basis allege, that defendant KEN WILLIAMS ("**Williams**") is an adult individual and a resident of California, who maintains his principal office and/or residence in Los Angeles, California, and is a co-chief executive officer of one or more Defendants, including without limitation Dial Global and Dial Communications.

31.     Plaintiffs are informed and believe, and on that basis allege, that defendant DAVID LANDAU ("**Landau**") is a co-chief executive officer of one or more Defendants, including without limitation Dial Global and Dial Communications.

32.    Plaintiffs are informed and believe, and on that basis allege, that defendant NORMAN J. PATTIZ ("**Pattiz**") is an adult individual and a resident of Los Angeles, California who maintains his principal place of business in Los Angeles, California. Plaintiffs are further informed and believe, and on that basis allege, that Pattiz is the current chief executive officer of Courtside and Courtside Entertainment, and a former founder, chairman of the board and chief executive officer of Dial Global during the period in which it was known as Westwood.

33.    Plaintiffs are informed and believe, and on that basis allege, that defendant PETER KOSANN ("**Kosann**") is an adult individual, and is the current chief executive officer of Compass Media and Compass Marketing, and a former chief executive officer of Dial Global during the period in which it was known as Westwood.

34.    Plaintiffs are informed and believe, and on that basis allege, that defendant RON HARTENBAUM ("**Hartenbaum**") is an adult individual, and is the current chief executive officer of WYD and a current senior executive of WYM.

35.    Plaintiffs are informed and believe, and on that basis allege, that those individual defendants who do not reside within Los Angeles, California regularly engage in business within Los Angeles, California.

36.    Plaintiffs are informed and believe, and on that basis allege, that the Defendants, and each of them, were and are the actual agents, and/or ostensible agents, and/or apparent agents, partners, joint venturers, co-conspirators, co-investors, representatives and/or employees of each of the remaining defendants, and in doing the acts or things alleged herein were acting within the course and scope of such agency, employment and/or other relationships stated herein.

37.    Plaintiffs are further informed and believe, and on that basis more particularly allege, that certain of the Defendants, including without limitation Dial Global, Dial Communications, Excelsior, Triton Group, Triton Media, Oaktree, Verge, Inc., Verge, LLC, Brown, Williams and Landau are members of a common ownership and control group and either control and/or are controlled by Dial Global and any subsidiary entities to Dial Global and/or any predecessor entities thereto (collectively, the "**Dial Group**" and, plural, "**Dial Group Members**").

38.    Plaintiffs are further informed and believe, and on that basis more particularly allege, that certain of the Defendants, including without limitation Courtside, Courtside Entertainment, Compass Media, Compass Marketing, WYD, WYM, Pattiz, Kosann and Hartenbaum, if and to the extent that they are not in fact Dial Group Members, are in fact acting in collusion with the Dial Group and conspiring

6

with the Dial Group, and/or are acting as surrogates for the Dial Group (plural or collectively, "**Dial Surrogates**"), for the purpose of disguising the involvement of the Dial Group, and/or assisting the Dial Group, with respect to certain of the unlawful and/or otherwise wrongful actions of the Dial Group as alleged by Plaintiffs in this Action, and that such conspiracy and collusion is effectuated through various means, including without limitation direct and/or indirect equity, financing or other forms of direct, beneficial or other interests.

## JURISDICTION AND VENUE

39.     Plaintiffs bring this Action pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, for treble damages, as well as reasonable attorneys' fees and costs of suit, for Defendants' violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, as well as Section 7 of the Clayton Act, 15 U.S.C. § 18, and additional claims for relief, as hereinafter alleged.

40.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1337 and 1367 and by Section 4 of the Clayton Act, 15 U.S.C. § 15.

41.     Jurisdiction is also conferred upon this Court by virtue of the diversity of citizenship between Plaintiffs and the Defendants, and in that the amount in controversy substantially exceeds the applicable threshold for diversity jurisdiction.

## PREAMBLE

42.     This is an antitrust and competitive tort case brought to preserve and restore competition to two specific markets: (i) the market for non-music, non-sports spoken word radio programming independently produced by producers which do not own or control, and which are not owned or controlled by, broadcasters owning or controlling multiple radio stations (the "**Independent Spoken Word Syndication Market**"); and (ii) the very specific market for representation of the various independent syndicators within the Independent Spoken Word Syndication Market in the sale of advertising to national advertisers operating via national advertising agencies (the "**Independents Ad Rep Market**").

43.     Plaintiffs are engaged in the production and national syndication on non-music, non-sports spoken word radio programming, including without limitation talk radio and news programming

7

("**Spoken Word Syndication**"). They contract with talent to serve as talk show hosts, they produce and/or distribute opinion talk radio shows, and they try to place these shows with radio stations throughout the country. For such placements, Plaintiffs are given radio air time which Plaintiffs then can sell to advertisers. The advertising revenues pay for the expenses of bringing this product to the public. This is the life blood of Plaintiffs' First Amendment product.

44.     Because Plaintiffs are independent syndicators engaged in Spoken Word Syndication within the Independent Spoken Word Syndication Market ("**Independent Spoken Word Syndicators**"), and not part of a group of owned radio stations with the audience numbers necessary to satisfy large advertisers, Plaintiffs and other Independent Spoken Word Syndicators are required to contract with radio advertising sales representatives to bundle the Independent Spoken Word Syndicators' air time with air time for other radio programming for advertising sales via the advertising agencies representing the large national institutional advertisers such as Ford, Procter and Gamble, etc.

45.     Because of this unique position, and because advertising revenue is the life blood of radio programming, the ad rep firm effectively controls the flow of revenues necessary to nourish and support the Independent Spoken Word Syndicators. Because of the effective need to bundle programming of multiple Independent Spoken Word Syndicators to achieve the audience sizes required within the Independents Ad Rep Market, there have been limited numbers of companies to perform this essential service for Independent Spoken Word Syndicators.

46.     Freedom of speech is not free. In all media, it requires advertising dollars to function. The vast majority of First Amendment expression on radio is funded by advertising sales handled by and through rep firms, which then transfer the ad revenues from the rep firm to the owners of syndicated spoken word programming. As such the power of the Independent Spoken Word Syndicators' sales rep firms to supply them with cash flow is essential to the ability of their programs to survive or thrive.

47.     Several years ago, there were at least multiple sales rep firms to supply Independent Spoken Word Syndicators with the fuel of advertising revenue, which, in turn makes the marketplace of ideas a vibrant one. However, as of the end of 2011, various previously viable rep firms for Independent Spoken Word Syndicators were effectively put out of business or have been swallowed up by one company – Dial Global – and, now, most of

8

America's Independent Spoken Word Syndicators are dependent on this one company for their revenue.

48.     Through acquisition after acquisition, the Dial Group's market position has evolved now to the point where they have an unprecedented monopoly power to potentially decide which Independent Spoken Word Syndicators will be financially viable on radio, which will not, and which they may be acquiring at their discretion as a result of their monopoly power within the Independents Ad Rep Market.

49.     Such power to control the financial fate of over 100 Independent Spoken Word Syndicators, held in the hands of unelected Wall Street executives, is chilling to the First Amendment, because that concentration of power over the financial destinies of so many syndicated providers of non-music, non-sports spoken word radio programming ("**Spoken Word Programming**") forces these programmers into silence, through the fear of financial repercussions from the rep firm these Spoken Word Programming providers depend on for their very survival.

50.     Armed with this economic power over the bottleneck of the institutional ad rep business for Independent Spoken Word Syndicators, Defendants have further embarked on a program of attempting to dominate the Independent Spoken Word Syndication Market.

51.     The Dial Group's power has grown to the point where they now have decided to compete with the very clients they rep, not only for content ownership – in violation of their original mission and inducements – but for their own clients' customers/radio station affiliates.

52.     Such moves by the Dial Group promise the eventual elimination of many independent syndicators and the ultimate control and acquisition of the talent of the Dial Group's own former syndicator/producer clients, resulting in the chilling of the First Amendment – all through monopoly control of the forces that underpin such freedoms for independent syndicators and content networks – ad sales – or lack of them – through the Dial Group

53.     Through a series of predatory acts utilizing their monopoly power, Defendants have launched a full scale attack on the Independent Spoken Word Syndicators, including

Plaintiffs, such that there is a dangerous probability that Defendants will dominate this market as well.

54.     As the largest privately held Independent Spoken Word Syndicators, it falls upon Plaintiffs' shoulders to stand up to the advance of this danger to all Independent Spoken Word Syndicators which depend on a free market of viable rep firms to compete with each other and act as the sales arm of syndicators/networks and content producers.

55.     With so many companies all but swallowed up by the Dial Group's acquisition and aggrandizement strategies, and behind the scenes financial machinations, Plaintiffs have watched the Dial Group move aggressively in the light of day to enter into the business of its own clients, while their clients stand by helplessly, unable to say a word for fear of being financially deprived – or left without a revenue stream at the Dial Group's hands.  As such, it falls to Plaintiffs to speak for those who cannot speak for themselves.

56.     Defendants began their relationships with Plaintiffs by fraudulently inducing Plaintiffs to commit to long term representation agreements by expressly representing to Plaintiffs that the Dial Group would never engage in activities which would present an actual or potential conflict of interest with respect to the duties owed to Plaintiffs by the Dial Group as Plaintiffs' advertising representatives, then utilized the strength of such long term representation agreements to generate investment dollars and place themselves in a position to accomplish and fulfill their anti-competitive merger, acquisition and expansion schemes.

57.     Upon eliminating by merger all viable alternative ad rep companies for the Independents As Rep Market which did not engage in conflict of interest programming, the Dial Group, in direct violation of their prior representations to Plaintiffs, began engaging in mergers and other activities which created direct conflicts of interest between the Dial Group and the ad rep obligations which they owed to Plaintiffs, as well as surreptitious and collateral activities designed to evade and violate such representations through seemingly indirect means and the attempted  surreptitious use of apparent surrogates.

58.     For these reasons, and many others, Plaintiffs reluctantly bring this Action to say "No more – this conduct will not continue".  If what the Dial Group has now done in the light of

day is any indication, this is the tip of the iceberg of what lies beneath. A monopoly control of the Independents Ad Rep Market as the funding source for syndicators/networks or content producers of Spoken Word Programming ultimately will result in the end of independent syndication as it is known today, and with it, the chilling of the First Amendment in too many ways to describe.

59.     Plaintiffs have been steadfast in their trusting loyalty to the Dial Group, and in recommending the pre-behemoth Dial entities to other Independent Spoken Word Syndicators, to the substantial benefit of the Dial Group. However, unknown to Plaintiffs, Plaintiffs have been used as part of a plan to "roll up" the other rep firms, and have been manipulated, along with various third parties, into actions which have contributed to making this newly minted monopoly possible.

60.     Today, by bringing this Action, Plaintiffs stand not only for themselves, but also for every smaller independent syndicator, network or programming producer, and for the hosts, producers, technicians and other Americans whose livelihoods are dependent upon these independent syndicators. In bringing this Action, Plaintiffs stand for the majority of America's 10,000 plus commercial stations which rely on a free and dynamic marketplace of syndicated products (in any form), which use syndication as a necessity to run their businesses, as well as the approximately 290 million plus Americans who are the listening audience for these 10,000 stations.

61.     America's 10,000 plus commercial radio stations, and their 290 million plus listeners, increasingly rely on syndicated programming provided by satellite, rather than locally produced radio programming, as a result of multiple economic factors which, for the most part, are beyond their ability to control, including in particular the overall deterioration of the nation's economy and national economic conditions and trends in general. As long as those 10,000 plus stations can have the benefit of a vibrant market for Spoken Word Programming with in excess of 100 truly independent syndication companies producing competing programming, both the commercial radio stations and the listening public continue to have access to the wide diversity of Spoken Word Programming produced by disparate Independent Spoken Word Syndicators

acting independently of each other. However, once a single company, such as Dial Global in this case, achieves a controlling position in the Independents Ad Rep Market, such that it controls the bulk of the revenues for the Independent Spoken Word Syndicators which are its customers in that market, and then actively seeks to secure, and then aggressively expand, its equity position as an active participant for its own account in the Independent Spoken Word Syndication Market (in direct competition with the Independent Spoken Word Syndicators it serves as agent for in the Independents Ad Rep Market), and combines that conflict of interest with the ability to allocate which Independent Spoken Word Syndicators receive what amounts from particular advertising buys within the Independents Ad Rep Market, without those Independent Spoken Word Syndicators who are independent of the Dial Group even knowing the true amount paid by the advertiser for advertising in their programs, the Dial Group can feed its programs, and starve those of its clients, such that its programming is disproportionately profitable, and the programming of the truly Independent Spoken Word Syndicators eventually becomes nonprofitable and, ultimately, non-viable.

62. The sudden death of CNN Radio News, after 20 plus years, and with over 1,100 station placements, and in a Presidential election year, based on an announcement by Dial Global, and Dial Global's replacement of that programming with programming carrying the NBC brand and controlled by the Dial Group on terms which simply were more favorable to the Dial Group, as hereinafter alleged, is perhaps the most telling example of the fate to befall numerous other Independent Spoken Word Syndicators if the Dial Group is not held accountable for its monopolistic, unlawful and improper actions. Under such circumstances, over and above the issue of quantifying the total amounts effectively being embezzled by the Dial Group from Independent Spoken Word Syndicators through its control over the revenue allocation process, the Dial Group, unless held accountable for its wrongful conduct and restrained from continuing such conduct in the future, will be able to use its control over the Independents Ad Rep Market to expand its dominance into, and ultimately control, the Independent Spoken Word Syndication Market, by picking off Independent Spoken Word Syndicators over time, as it has now done with respect to CNN Radio News. When this occurs, the damages will not be limited to the affected

12

Independent Spoken Word Syndicators and the persons relying on them for their livelihoods. The damages will extend also to America's 10,000 plus commercial radio stations which will have substantially less diversity of Spoken Word Programming to choose from, and the 290 million plus Americans who listen to those radio stations, who will have substantially less diversity of Spoken Word Programming to listen to.

63.    The end result of allowing the Dial Group to continue on its present path unchecked will be to have a limited number of radio broadcasters which control substantial numbers of radio stations throughout the country also controlling their own content producers and producing syndicated Spoken Word Programming primarily for their own station groups, plus Dial Global and the rest of the Dial Group (possibly in collaboration with various Dial Surrogates if the Dial Group does not elect to roll up the Dial Surrogates as well after rolling up the truly Independent Spoken Word Syndicators) controlling virtually all of the remaining Spoken Word Programming, such that owners of a single radio station or small numbers of radio stations (below the number necessary for the major station groups to achieve their own critical mass level sufficient to produce national advertising for the programming) left with the choice to take the Spoken Word Programming produced by their relatively giant competitors, if those competitors will even make that programming available to them in their local market, or to take Spoken Word Programming selected by the Dial Group.  Their ability to choose from a diverse array of Spoken Word Programming offered by a diverse array of Independent Spoken Word Syndicators actually and truly acting independently of each other will have been destroyed.

64.    By initiating legal action to address the Dial Group's monopolistic and other anti-competitive practices, Plaintiffs  also begin a fight not only for the future of free speech in America but also to prevent unelected Wall Street executives from controlling the future of the First Amendment as it relates to media – radio more specifically.  An unelected monopoly controlled by Wall Street executives cannot be allowed to pick winners, create losers or be allowed to benefit from the power to create either.

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT AND THE CLAYTON ACT, AND FOR FRAUDULENT INDUCEMENT, INTERFERENCE WITH CONTRACT AND PROSPECTIVE ECONOMIC ADVANTAGE

# INITIAL OVERVIEW

65. Through a series of anticompetitive mergers and acquisitions, as well as other anticompetitive and wrongful actions, the Dial Group have come to dominate the Independents Ad Rep Market, and the Defendants are actively engaged in efforts to dominate the Independent Spoken Word Syndication Market.

66. In this regard, Plaintiffs are informed and believe, and on that basis allege, that the Dial Group now controls approximately 95% of the Independents Ad Rep Market. As a result, the Dial Group has achieved a stranglehold on the vast majority of the Independent Spoken Word Syndicators, such as Plaintiffs. Thus, the Dial Group is in the process of securing undue levels of control over what is heard and not heard on radio.

67. By effectively controlling approximately 95% of the Independents Ad Rep Market, and therefore the flow of advertising revenue for Independent Spoken Word Syndicators, the Dial Group has become the bottleneck through which the predominate share of the revenues which fund the Independent Spoken Word Syndication Market flow. Moreover, the Dial Group has utilized this position to embark on a program of attempting to dominate the business of independent spoken word radio syndication, controlling first the access of Independent Spoken Word Syndicators to the national advertising necessary to their profitable operations via the Dial Group's control over the Independents Ad Rep Market, and then acquiring or otherwise controlling the Independent Spoken Word Syndicators and/or their programming, whether by mergers, acquisitions, joint ventures or other means, either directly and/or indirectly via one or more Dial Surrogates.

68. Through a series of predatory acts utilizing their increasing monopoly power, the Dial Group has launched a full scale attack on the Independent Spoken Word Syndicators, including Plaintiffs, such that there is a dangerous probability that Defendants will dominate this content market in addition to dominating the Independents Ad Rep Market.

69. To cite just one compelling and chilling example, Plaintiffs are informed and believe, and on that basis allege, that, on or about March 1, 2012, Dial Global announced its intention to discontinue distributing the top and bottom of the hour radio news reports (short news reports that start at the beginning of the hour and on the half hour) of CNN Radio News, on or about April 1, 2012. This forced CNN Radio News to surrender approximately 1,100 radio station placements for its news reports and to discontinue that line of business after approximately 20 years of prior operation, in a Presidential election

14

year, thus eliminating that significant news source for the American public simply to satisfy the Dial Group's appetite for aggrandizement. Plaintiffs are further informed and believe, and on that basis allege, that this destruction of CNN news programming was undertaken by the Dial Group in order to replace the CNN news programming with NBC branded news content controlled by the Dial Group.

70.     Plaintiffs are further informed and believe, and on that basis allege, that the Dial Group has reached this level of power and dominance by an ongoing pattern of unlawful, wrongful and otherwise illicit and improper means over a series of years. These include, without limitation: (i) fraudulent misrepresentations; (ii) elimination of competition and alternate independent service providers capable of providing truly independent ad rep services for Independent Spoken Word Syndicators, through various mergers, acquisitions and other actions; (iii) fraudulent inducements and other wrongful actions designed to preclude third parties damaged by the Defendants' schemes from pursuing effective remedies; (iv) unlawful, improper and wrongful conduct designed to weaken companies, such as Plaintiffs, which insist on maintaining their right to independence, in an effort to soften their resistance to the Dial Group's control via acquisitions, mergers or other means, or, failing that, designed to directly and/or indirectly interfere with such companies' contract rights, prospective economic advantage and revenues by various means, for the purpose of acquiring ownership or control of such companies' programs, hosts or other talent; (v) by engaging in fraudulent allocations and distributions of advertising revenues which they have collected for Independent Spoken Word Syndicators, in their capacity as ad reps for such syndicators in the Independents Ad Rep Market, in order, in effect, to embezzle millions in revenues from such Independent Spoken Word Syndicators; (vi) by expressly and/or impliedly misrepresenting the level of advertiser payments for particular ads, and/or failing to disclose to the Independent Spoken Word Syndicators they are serving as ad reps for the true amounts paid by advertisers for ads, in order to preclude discovery of their improper revenue allocation schemes; (vii) by utilizing such improperly procured proceeds to fund the expansion of the Dial Group's unlawful and manipulative activities; (viii) by violating their representations, inducements, commitments and assurances to Plaintiffs; (ix) by utilizing the Dial Surrogates in attempts to evade discovery of the Dial Group's direct and/or indirect efforts to violate its representations, inducements, commitments and assurances to Plaintiffs; (x) by misrepresenting to third parties the nature of the Dial Group's relationship to Plaintiffs' programming for the purpose of securing financing to fund the Dial Group's ongoing efforts at expansion and aggrandizement and other improper purposes; (xi) by colluding with various Dial Surrogates and others to violate their obligations to Plaintiffs or other persons or entities, and/or to induce

15

others to violate their obligations to Plaintiffs or others, for the purpose of facilitating the Dial Group's objectives of expanding their enterprises via unlawful, illicit, manipulative and improper means; and (xii) by multiple other actions, schemes and devices which Plaintiffs shall hereafter describe in this Complaint or otherwise demonstrate in the course of this Action.

## FACTS WHICH FORM THE BASIS OF THE VIOLATIONS ALLEGED

71.    In 2000, OTRN became a client of Dial I (a predecessor to Dial Communications), which then had a minimal market share and flow of advertising revenue within the Independents Ad Rep Market, and, most importantly to OTRN, also did not have any financial interest in any spoken word radio shows that would create a conflict of interest in the duty of the advertising sales rep to represent the advertising sales interests of its client Independent Spoken Word Syndicators. Plaintiffs are informed and believe, and on that basis allege, that OTRN was a principal original client, if not the principal client, of Dial I at that time.

72.    In order to induce OTRN to place its business with Dial I initially, Dial I, acting through Williams and Landau, expressly represented and warranted to OTRN that Dial I would avoid any possibilities of any actual or apparent conflicts of interest in its representation of OTRN within the Independents Ad Rep Market by not engaging, either directly or indirectly, in Spoken Word Syndication for its own account.

73.    Dial I, acting through Williams and Landau, further induced OTRN to use Dial I over another advertising representative firm, Jones America, by stating that Jones America had an interest in some of the talk radio shows for which Jones America was providing advertising representation services.

74.    A potential conflict of interest by an advertising representative firm, such as Dial I, Dial Communications and/or Dial Global, depending on the time frame, engaging in Spoken Word Syndication for its own account was and is of substantial concern to Plaintiffs. The reason for this concern is that the advertising rep firm could bundle Plaintiffs' spoken word programs with other spoken word programs that the rep firm owned or had an interest in, directly or indirectly. The rep firm would then get a set dollar amount from a national advertiser based upon the audience reached by the bundled spoken word programs. The Dial Group, as the parties in control of the allocation of the total fee, would then have an interest in funneling more of the dollars from the national advertiser to the spoken word programs that Defendants had an interest in, to the detriment of Plaintiffs.

75.     Because Plaintiffs are Independent Spoken Word Syndicators, and not part of a group of owned radio stations with the audience numbers necessary to satisfy large advertisers, Plaintiffs and other Independent Spoken Word Syndicators effectively are required to contract with radio advertising sales representatives to bundle their air time with air time for other radio programming for advertising sales via the advertising agencies representing large national institutional advertisers (such as Ford, Procter and Gamble, etc.).   For this service, the advertising sales representative firm typically receives 20-25% of the advertising revenue, net of agency fees, as its sales rep commission (generally the advertiser's advertising agency deducts a 15% agency fee from the amount paid by the advertiser), and should transmit the balance of such revenue to the Independent Spoken Word Syndicators.

76.     For a hypothetical example, the Dial Group might approach an advertiser, via the advertiser's ad agency, with a talk radio bundle consisting of one or more of Plaintiffs' talk show programs, and various other talk radio programs of various other talk radio syndicators.   Assuming hypothetically that one of Plaintiffs' programs brings in 250,000 listeners and another of Plaintiffs' programs brings in 250,000 listeners and the other bundled programs bring in 500,000 listeners, for a total audience of 1,000,000 listeners, and the advertiser agrees to pay a $1,000,000 fee for an advertisement to play at a designated number of commercial breaks on each of the bundled talk radio shows, $150,000 of that fee would go to the agency fee payable to the advertiser's ad agency, leaving a net of $850,000.  Dial Global should then take its commission of approximately 25% of the $850,000, leaving $637,500 for the owners of the bundled talk radio shows.  The $637,500 should then be allocated by the Dial Group to those talk radio shows based upon the percentage audience they brought in.   Plaintiffs should get $159,375 for the 250,000 listeners (25% of the total listeners) of one show they produced and another $159,375 for the 250,000 listeners (25%) for the other show they produced, and the owners of the other shows in the bundle should get $318,750 for the 500,000 listeners (50%) for their shows.

77.     In the example above, if Dial Global had an interest in the other shows in the bundle, Dial Global could directly benefit by allocating 75% of the total fee to those other shows, even though they only brought in 50% of the listeners.  In that event, Plaintiffs, which should have received $318,750 for their two shows (50% of the net proceeds after commission), would only receive $212,500 (25% of the net proceeds after commission), a shortage of $106,250 which Plaintiffs would not be aware of, as the Dial Group controls the allocations and only reports to Plaintiffs the amounts which Plaintiffs are to receive from the buy, and fraudulently expressly and/or impliedly represents to Plaintiffs (as well as to any other third party syndicators similarly taken advantage of by such improper actions in the Dial

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT AND THE CLAYTON ACT, AND FOR FRAUDULENT INDUCEMENT, INTERFERENCE WITH CONTRACT AND PROSPECTIVE ECONOMIC ADVANTAGE

Group's handling of the advertising revenues) that the amount allocated to Plaintiffs' programs is the amount which the Dial Group, as their ad sales representative, was able to sell the ad time for.

78.     The Dial Group fraudulently induced Plaintiffs to commit to long term representation agreements, exclusively with the Dial Group, for sales rep services in the Independents Ad Rep Market, by expressly representing to Plaintiffs that the Dial Group: (i) would never engage in activities which would present an actual or potential conflict of interest with respect to the duties owed by the Dial Group to Plaintiffs as Plaintiffs' advertising representatives; and (ii) would never seek to inure to the Dial Group Plaintiffs' programming, hosts, producers or proprietary business information. The Dial Group then utilized the strength of such long term representation agreements to generate investment dollars and place themselves in a position to accomplish and fulfill their anti-competitive schemes through mergers and/or acquisitions and other devices.

79.     Upon eliminating by merger all viable alternative advertising representative firms for the Independents Ad Rep Market which did not engage in conflict of interest programming, the Dial Group, in direct violation of their prior representations to Plaintiffs, began engaging in mergers and other activities, including acquisition and development of the Dial Group's own spoken word radio programming within the Independent Spoken Word Syndication Market, which created direct conflicts of interest between the Dial Group and the ad rep obligations which they owed to Plaintiffs, as well as surreptitious and collateral activities designed to evade and violate such representations through seemingly indirect means, and the attempted  surreptitious use of apparent surrogates, including without limitation various Dial Surrogates.

80.     Plaintiffs did not know at the time, but are now informed and believe, that Williams, Landau and Dial I, at the time of their initial representations to OTRN, and thereafter including Brown and Dial Communications at the time of future such representations, had no intention of avoiding a conflict of interest when they fraudulently induced Plaintiffs to tie Plaintiffs' sales representation within the Independents Ad Rep Market to the Dial Group. Plaintiffs further allege on information and belief that the Defendants' actual intent was to dominate both the Independents Ad Rep Market and the Independent Spoken Word Syndication Market.

18

**DIAL GLOBAL'S CONSOLIDATION OF POWER: 2002 MERGER**

81.     Plaintiffs are informed and believe, and on that basis allege, that, in or about April of 2002, Dial I merged with the Global Media Division of Excelsior, with the merged entity (apparently Dial Communications) under the continuing supervision of Williams and Landau and a former partner in Dial I and Dial Communications as co-presidents, in order to create what was then described by the Dial Group as "an industry leading national radio sales representation company with anticipated 2002 advertising sales revenue of $50 million and a client roster of over forty independent radio production companies".

82.     From and after that 2002 merger, Brown, acting as the CEO of Excelsior, began to become active in the interactions between Dial Communications and Plaintiffs, and eventually became the primary representative of the Dial Group interacting with Plaintiffs at the executive level.

**THE DIAL GROUP'S ONGOING REPRESENTATIONS AND INDUCEMENTS**

83.     Upon the formation of TRNE in 2003 and TRN-FM in 2004, the Dial Group, now communicating with Plaintiffs through Brown, Williams and Landau, repeated to TRNE and TRN-FM their prior representations, inducements, promises, assurances, and commitments to OTRN to the effect that the Dial Group would never engage in any actual or apparent conflict of interest in their ad representation of Plaintiffs by engaging, either directly or indirectly, in Spoken Word Syndication for their own account, and would not seek to inure the programs, hosts, producers and other proprietary rights of TRN-E and TRN-FM, respectively, to the Dial Group's own purposes.

84.     As a result of such representations by the Dial Group to Plaintiffs, first OTRN, then TRNE and then TRN-FM agreed to retain the Dial Group as their sole ad rep in the Independents Ad Rep Market, for all of Plaintiffs' programming, and further recommended the Dial Group to other Independent Spoken Word Syndicators, thus materially facilitating the Dial's Group's expansion in multiple respects.

85.     During such period, Plaintiffs' CEO developed what he believed to be a strong bond of mutual respect and trust with Brown, in particular, as a result of the ongoing communications from Brown which he understood to be communicated on an executive to executive business basis, and without knowledge at the time that Brown had a legal background as a commercial litigator. Regardless of whether the perception on the part of Plaintiffs' CEO of mutual trust and respect was accurate, Plaintiffs developed complete faith and trust in Brown as someone they then perceived to be a person of integrity

19

who could be relied upon to ensure that the Dial Group would fulfill its obligations to Plaintiffs as their sales representative.

86.    Plaintiffs also provided Plaintiffs' business plans to the Dial Group, on a confidential basis, also based upon the representations from the Dial Group to Plaintiffs that the Dial Group would never engage in Spoken Word Syndication for their own account or otherwise participate in activities which would create a conflict of interest with respect to their serving as Plaintiffs' sales representative within the Independents Ad Rep Market, or inure Plaintiffs' programs, talent or proprietary information to the Dial Group's account.

## THE DIAL GROUP'S CONSOLIDATION OF POWER: 2008 MERGER WITH JONES MEDIA

87.    Plaintiffs are informed and believe, and on that basis allege, that, in or about June of 2008, the Dial Group acquired Jones Media Group and the operating companies of Jones Media (Jones America, Jones Radio Networks and JonesTM) in order, as stated in a press release on such acquisition, to obtain "industry-leading positions in national advertising sales representation" and other radio markets.

88.    During the course of the merger and acquisition activities with the Jones Media companies, the Dial Group, now acting primarily through Brown, initially represented to Plaintiffs that the Dial Group would be acquiring the rights to certain long form talk radio programming as a result of that merger, and that, in order to comply with their agreements, representations, inducements and commitments to have no conflicts of interest by owning or controlling other talk radio shows, they would divest such shows to Plaintiffs following their acquisition of such rights.

89.    Notwithstanding these representations, after the Dial Group acquired the rights to various programs that created a conflict of interest as a result of the merger with Jones Media, the Dial Group failed and declined to divest such programs, contrary to what the Dial Group had represented they would do, claiming that third party impediments precluded this, and instead, in December of 2008, extended enhanced commitments, representations, inducements, promises and assurances from the Dial Group that, with the exception of any talk radio shows and/or syndication contracts which the Dial Group acquired upon the acquisition of Jones Media  and one additional weekday talk show which was described but not identified by name, the Dial Group would have no equity or other financial interest in other independent spoken word shows, and would not engage in the broadcast or syndication of, or announce

the intention to commence, any news and/or political talk programming, and/or long form weekday talk programming of any kind, during the term of Dial's representation of Plaintiffs.

90. Plaintiffs are informed and believe, and on that basis allege, that, as a result of the merger with Jones Media, Dial had now increased its market share to approximately forty-five percent (45%) of the Independents Ad Rep Market and provided advertising representation services to over 200 independent programs and networks.

91. Although Plaintiffs had not realized it in 2002, the 2002 merger which resulted in the combination of Dial I with Excelsior's Global Media Division resulted in Dial Communications being the only significant rep firm for the Independents Ad Rep Market which did not also rep its own conflict programming. Plaintiffs are now further informed and believe, and on that basis allege, that this situation continued until the Dial Group acquired interests in various talk radio programs as a result of the Jones transactions in 2008.

92. As a result of the merger with Jones Media, the Dial Group effectively eliminated any options for Plaintiffs, or other Independent Spoken Word Syndicators, to place their business with a vendor which was not directly or indirectly interested in conflict of interest programming, and left Plaintiffs with no viable alternatives for utilizing a different advertising representative firm for the Independents Ad Rep Market, since the only remaining significant ad rep firms for the Independents Ad Rep Market had talk radio shows that also would create a conflict of interest.

93. As a result, in reliance on what Plaintiffs then perceived to be the Dial Group's absolute representations, inducements, promises, assurances, commitments and agreements not to obtain any additional talk radio shows that would create a conflict of interest, Plaintiffs did not take action at the time, and instead continued to retain Dial Communications to provide services for them, and , in December of 2008, agreed to the Dial Group's proposal for capping the Dial Group's conflict of interest programming involvement at the programs the Dial Group acquired in the Jones transactions, plus an additional program described generically at the time, and later identified as The Michael Smerconish Show.

## DIAL GLOBAL'S CONSOLIDATION OF POWER: 2011 WESTWOOD ONE MERGER

94. Plaintiffs are informed and believe, and on that basis allege, that within months after the Dial Group made renewed representations, inducements, assurances, promises and binding commitments

21

to Plaintiffs in December of 2008 to refrain from bringing on any new spoken word programming, the Dial Group began secret negotiations to acquire and/or merge with Westwood, and, as a result, to take on significant additional spoken word programming from Westwood, as well as to acquire certain talk programming previously syndicated by Air America, all in direct contravention of the representations, promises, inducements, assurances and commitments made by the Dial Group to Plaintiffs in this regard. In addition to the foregoing actions in violation of the representations, promises, inducements, assurances and commitments made to Plaintiffs in December of 2008, the Dial Group, both directly and in concert with certain of the Dial Surrogates, has acquired and/or developed other spoken word programs for their own account subsequent to calendar year 2008.

95. Plaintiffs are informed and believe, and on that basis allege, that the Westwood Merger took place on or about October 21, 2011, and that, following this merger, Dial Global's market share within the Independents Ad Rep Market has now increased to approximately ninety-five percent (95%).

96. As such, Plaintiffs are informed and believe, and on that basis allege, that, through a series of three (3) anti-competitive mergers as described above, the Dial Group has acquired all of the significant competitors within the Independents Ad Rep Market and effectively eliminated meaningful competition for the representation of Independent Spoken Word Syndicators within the Independents Ad Rep Market.

97. Plaintiffs are informed and believe, and on that basis allege, that, once the Dial Group achieved its monopolistic objectives via its successive anti-competitive merger activities, the Dial Global effectively controlled the predominate portion of the revenues for Independent Spoken Word Syndicators, making such syndicators, including without limitation Plaintiffs, dependent on Dial Global continuing to act as their advertising representative in procuring revenues for them.

## DIAL GLOBAL'S EFFORTS TO EVADE ITS REPRESENTATIONS

98. Plaintiffs are informed and believe, and on that basis allege, that Compass Media was formed within approximately 30-45 days after the Dial Group represented that, other than the shows the Dial Group acquired through the Jones merger, and one other show later identified as The Michael Smerconish Show, the Dial Group would acquire no additional shows that would create a conflict of interest with respect to its sales rep activities for Plaintiffs.

22

99.     Plaintiffs are further informed and believe, and on that basis allege: (i) that Compass Media and thereafter Compass Marketing were formed for the purpose of creating the false appearance of an independent content provider, without disclosing to Plaintiffs the nature of the interests and control of the Dial Group with respect to Compass Media and Compass Marketing; (ii) that Courtside and Courtside Entertainment have been formed, utilized and/or were intended to serve a similar purpose; and (iii) that WYD and WYM also have been formed, utilized and/or intended to serve a similar purpose.

100.     Notwithstanding the express commitments and further representations hereinabove alleged, Plaintiffs are informed and believe, and on that basis allege, that the Dial Group has now acquired interests in multiple additional programs that create a conflict of interest with respect to its obligations to Plaintiffs and other Independent Spoken Word Syndicators.

101. · At various times, the Dial Group, both directly and through Westwood prior to the consummation of the Westwood Merger, has sought to procure a merger with, and/or acquisition of, Plaintiffs and/or their programming, whether directly or indirectly, which efforts have been declined.

102.     Plaintiffs are informed and believe, and on that basis allege, that such merger/acquisition efforts involving Plaintiffs, whether directly or indirectly, are part of Defendants' efforts to both expand their enterprises and dominate the markets in which they do business, through multiple anti-competitive mergers and/or acquisitions, as well as other anti-competitive schemes and actions, with corresponding reductions in competition within specific components of the radio industry, including without limitation and in particular the Independents Ad Rep Market and the Independent Spoken Word Syndication Market.

103.     Plaintiffs are further informed and believe, and on that basis allege, that the actions of Defendants, and each of them, as alleged herein, and additional actions of the Defendants to be established by evidence further developed, documented and/or discovered during the course of this Action, are motivated, at least in part, by a desire to wrongfully and improperly damage and weaken Plaintiffs and/or their affiliates, in the hopes of making them more susceptible to merger and/or acquisition proposals on Defendants' terms, or, barring that, to penalize Plaintiffs for the failure of any officers or parents of Plaintiffs to support a potential merger with, and/or acquisition by, one or more of the Defendants.

104.     Plaintiffs are informed and believe, and on that basis allege, that, on multiple occasions, Defendants interacted improperly with certain of Plaintiffs' hosts, including without limitation direct and/or indirect communications with such hosts, for the benefit or intended benefit and/or designs of

Defendants, and that Defendants have initiated improper communications with certain of Plaintiffs' hosts, outside and beyond the scope of legitimate advertising sales issues addressed in collaboration with Plaintiffs, and have further engaged, both directly and through certain of the Dial Surrogates, in spreading false and defamatory statements and rumors concerning Plaintiffs, and/or Plaintiffs' shows and/or hosts under contract with Plaintiffs, both during industry conferences and otherwise, for the purpose of creating false and/or misleading impressions of Plaintiffs among Plaintiffs' hosts, customers and business associates throughout the radio industry. Plaintiffs are further informed and believe, and on that basis allege, that such improper actions included, without limitation, various actions designed to create false impressions that certain of Plaintiffs' shows have in fact become the Dial Group's shows.

105. Plaintiffs are further informed and believe, and on that basis allege, that the Defendants, and each of them, are attempting to utilize Compass Media, Compass Marketing, Courtside, Courtside Entertainment and now WYD and WYM, as well as Pattiz, Kosann, Hartenbaum and other individuals and/or entities with substantial and ongoing ties to one or more Dial Group Members, as a means to disguise their direct and/or indirect efforts to utilize Dial Global's status as the sole sales representative for Plaintiffs within the Independents Ad Rep Market as a means of seeking improper inurement with respect to hosts and other talent of Plaintiffs, as to which Defendants have procured access and confidential financial information by virtue of such status, and in direct contravention of multiple representations, commitments, assurances, promises and inducements from the Dial Group to Plaintiffs that the Dial Group would not seek or accept any such improper inurement.

106. Plaintiffs are further informed and believe, and on that basis allege, that the Defendants are actively seeking to interfere with Plaintiffs' contract rights and prospective economic advantages with multiple talk radio hosts of Plaintiffs by means of various direct and/or indirect communications with such hosts, without Plaintiffs' knowledge, participation or consent, and by use of confidential and proprietary knowledge concerning Plaintiffs' advertising revenues, clients and radio station clearances obtained by the Dial Group in its capacity as an agent for Plaintiffs, and that the Dial Surrogates are working in collusion with the Dial Group and other Defendants in this regard.

107. Plaintiffs are further informed and believe, and on that basis allege, that the Defendants are also seeking to interfere with Plaintiffs' contract rights and prospective economic advantage with current and/or potential hosts and/or radio station affiliates for Plaintiffs' programming in multiple ways, including without limitation: (i) improper use of information obtained as to Plaintiffs' activities in such areas obtained through the Dial Group's status as Plaintiffs' advertising representative, and from the Dial

24

Group's status as a satellite service provider for Plaintiffs' independent programs, both for the purpose of procuring improper advantages for the Defendants' ever increasing interests in and/or attempted control of the Independent Spoken Word Syndication Market. and for the purpose of attempting to damage Plaintiffs in an effort to try to obtain the rights to Plaintiffs' independent programs and/or the hosts of such programs on Defendants' terms; (ii) by spreading and/or attempting to spread rumors within the radio industry of purported imminent losses by Plaintiffs of particular hosts and/or programs, and thus creating perceptions and/or fears among Plaintiffs' customer base of instability and/or future inabilities of Plaintiffs to perform, and thus interfering with Plaintiffs' efforts to procure radio station placements for Plaintiffs' independent programs; (iii) by engaging in improper allocation schemes with respect to the advertising revenues actually generated by Plaintiffs' programs, thus creating false perceptions of the actual revenues generated by those programs; and (iv) by various other means as hereinabove alleged, or as otherwise shall be duly established in the course of this Action.

108.     On March 1, 2012, Dial Global announced its intention, pursuant to one or more underlying agreements with NBC News, to present a 24 hour per day all news radio network, with distribution and ad rep services to be provided by Dial Global, in further violation of Dial's representations, inducements, commitments, promises, assurances and agreements to not obtain an interest in any more spoken word programs that would create a conflict of interest for the Dial Group's advertising sale representation of Plaintiffs.  Plaintiffs are further informed and believe, and on that basis allege, that the Dial Group has one or more agreements with NBC that provide for significant involvement and/or control by the Dial Group, as well as equity and/or revenue interests, in news and/or other programming distributed by the Dial Group in collaboration with NBC and/or utilizing the NBC name.

109.     Plaintiffs are informed and believe, and on that basis allege, that certain proprietary business models, plans and information given to the Dial Group by Plaintiffs in confidence, for the purpose of confidential consulting with the Dial Group as Plaintiffs' ad sales representative, has been utilized by the Dial Group in developing the Dial Group's secret strategies for expanding its business activities into the intellectual rights ownership inherent in the production and ownership of programming content in the Independent Spoken Word Syndication Market.

## THE DIAL GROUP'S REFUSAL TO CORRECT ALLOCATION MISCONDUCT AND OTHER WRONGDOING

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT AND THE CLAYTON ACT, AND FOR FRAUDULENT INDUCEMENT, INTERFERENCE WITH CONTRACT AND PROSPECTIVE ECONOMIC ADVANTAGE

110. Plaintiffs are informed and believe, and on that basis allege, that Defendants have attempted to monopolize the Independents Ad Rep Market by the means and the overt acts set forth above, including their combination and conspiracy, predatory allocations and pricing, anticompetitive mergers, and their knowing and intentional interference with Plaintiffs' host, customer and potential host and customer relationships. In serving as Plaintiffs' ad sales representative within the Independents Ad Rep Market, and in collecting all of Plaintiffs' revenues generated by the Dial Group within that market, the Dial Group acts, and should be deemed to act, in accordance with the obligations of a trustee for Plaintiffs with respect to that portion of the advertising revenues collected by the Dial Group attributable to Plaintiffs' programming. Plaintiffs are informed and believe, and on that basis allege, that: (i) the prices which the Dial Group advised Plaintiffs that it obtained for advertising on Plaintiffs' shows did not actually state the amounts actually received by the Dial Group for such advertising; (ii) the Dial Group has in fact expressly and/or impliedly fraudulently misrepresented the amounts of such advertising in order to induce acceptance by Plaintiffs of the prices and advertising orders as reported to Plaintiffs by the Dial Group; and (iii) the Dial Group failed to report to Plaintiffs the full prices received by the Dial Group for such advertising, and has affirmatively hidden and kept such information from Plaintiffs.

111. Plaintiffs have demanded that the Dial Group allow Plaintiffs to conduct a full audit of the records relating to the amounts collected by the Dial Group, and the proper amounts payable to Plaintiffs with respect thereto, but the Dial Group has failed and refused to permit Plaintiffs to do so.

112. Plaintiffs have also demanded that the Dial Group duly divest itself of the spoken word programming which the Dial Group has obtained interests in, in violation of its representations, inducements, promises, assurances and commitments to Plaintiffs, and otherwise fully comply with all of such representations, inducements, promises, assurances and commitments to, and agreements with, Plaintiffs. However, although the Dial Group, acting through Brown, expressly represented to Plaintiffs that the Dial Group would comply fully with all of its representations, inducements, promises, assurances and commitments to, and agreements with Plaintiffs upon the consummation of the Westwood Merger, the Dial Group has failed and refused, and continues to fail and refuse, to do so.

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT AND THE CLAYTON ACT, AND FOR FRAUDULENT INDUCEMENT, INTERFERENCE WITH CONTRACT AND PROSPECTIVE ECONOMIC ADVANTAGE

## CONSPIRACY

113.    Plaintiffs are further informed and believe, and on that basis allege, that the Defendants, and each of them, are parties to a conspiracy to engage in the acts and conduct described herein in order to damage Plaintiffs, and, ultimately, to procure the benefits of Plaintiffs' independent programming, and/or the services of the hosts of such independent programming, and/or Plaintiffs' proprietary program formats and other confidential and proprietary information of Plaintiffs, for their common scheme and enterprise, by wrongful, improper and unlawful means.

114.    Plaintiffs are informed and believe, and on that basis allege, that various other persons, firms and corporations, not named as Defendants herein, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of such conspiracy, and that the Defendants have engaged in additional acts and conduct in furtherance of such conspiracy which will be identified in the course of discovery in this Action and established by evidentiary presentations in due course in this Action.

## INTERSTATE COMMERCE

115.    Plaintiffs are informed and believe, and on that basis allege, that the activities of  the Defendants and their co-conspirators, as hereinabove alleged, were within the flow of, and substantially affected, interstate commerce.

116.    Plaintiffs are informed and believe, and on that basis allege, that the conspiracy in which the Defendants and their co-conspirators have participated, as hereinabove alleged, has had a direct, substantial, and reasonably foreseeable effect on United States commerce.

## FRAUDULENT CONCEALMENT

117.    Plaintiffs are informed and believe, and on that basis allege, that the Defendants have sought to effectuate the agreement, contract, combination and conspiracy alleged in this complaint by means of deceptive practices and methods of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and to fraudulently conceal, their agreement, contract, combination and conspiracy, including without limitation secret meetings, misrepresentations, destroying or concealing

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT AND THE CLAYTON ACT, AND FOR FRAUDULENT INDUCEMENT, INTERFERENCE WITH CONTRACT AND PROSPECTIVE ECONOMIC ADVANTAGE

evidence of their illegal conduct, and the use of Dial Surrogates in an effort to hide the involvement of the Dial Group in multiple actions in furtherance of such conspiracy, including without limitation efforts of the Dial Group to evade their representations, inducements, promises, assurances and commitments to Plaintiffs to refrain from engaging in conflict programming and to refrain from seeking or obtaining inurement with respect to Plaintiffs' hosts, programs, producers and proprietary business information.

118. The affirmative acts of the Defendants alleged herein, including without limitation acts in furtherance of their conspiracy, have been wrongfully concealed and carried out in a manner that precluded detection.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**(Conspiracy in Restraint of Trade With Respect to the Independents Ad Rep Market in Violation of Section 1 of the Sherman Act)**

119. Plaintiffs reallege and incorporate, as if fully alleged herein, each of the allegations contained in the preceding paragraphs of this complaint, and further allege against Defendants, and each of them, as follows:

120. Plaintiffs are informed and believe, and on that basis allege, that Defendants and their co-conspirators have engaged in a continuing contract, combination or conspiracy, as herein alleged, in unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

121. Plaintiffs are informed and believe, and on that basis allege, that Defendants and their co-conspirators engaged in the actions hereinabove alleged for the purposes of carrying out their unlawful agreements and actions, and to improperly dominate the Independents Ad Rep Market.

122. As a direct and proximate result of the illegal combination, contract or conspiracy alleged herein, Plaintiffs have been injured and financially damaged in their business and property, in amounts to be determined in this Action. Accordingly, Plaintiffs are entitled to treble damages and costs of suit, including reasonable attorneys' fees, pursuant to Section 4 of the Clayton Act, and a preliminary and permanent injunction restraining Defendants from continuing to violate Section 1 of the Sherman Act, 15 USC § 1, as alleged above.

## SECOND CLAIM FOR RELIEF

**(Conspiracy to Monopolize the Independents Ad Rep Market in Violation of Section 2 of the Sherman Act)**

123. Plaintiffs reallege and incorporate, as if fully alleged herein, each of the allegations contained in the preceding paragraphs of this complaint, and further allege against Defendants, and each of them, as follows:

124. Plaintiffs are informed and believe, and on that basis allege, that, in violation of Section 2 of the Sherman Act, 15 U.S.C § 2, Defendants knowingly, intentionally and with specific intent to do so, conspired to monopolize the Independents Ad Rep Market.

125. Plaintiffs are informed and believe, and on that basis allege, that Defendants have effectuated their conspiracy to monopolize the Independents Ad Rep Market by the means and the overt acts hereinabove alleged.

126. Plaintiffs are informed and believe, and on that basis allege, that, as a direct and proximate result of Defendants' anti-competitive conduct, as alleged herein, Defendants have conspired to control, and unless restrained and enjoined by the Court, have a substantial likelihood of controlling, close to the entirety of the Independents Ad Rep Market, and that this control, coupled with the illegal combination and conspiracy hereinabove alleged, will result in a dangerous likelihood that Defendants will monopolize the Independents Ad Rep Market.

127. As a direct and proximate result of Defendants' illegal, anti-competitive conspiracy to monopolize the Independents Ad Rep Market, Plaintiffs have suffered serious injury to their business and property. Accordingly, Plaintiffs are entitled to treble damages and costs of suit, including reasonable attorneys' fees, pursuant to Section 4 of the Clayton Act, and a preliminary and permanent injunction restraining Defendants from continuing to violate Section 2 of the Sherman Act, 15 USC § 2, as alleged above.

## THIRD CLAIM FOR RELIEF

**(Attempting to Monopolize the Independents Ad Rep Market in Violation of Section 2 of the Sherman Act)**

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT AND THE CLAYTON ACT, AND FOR FRAUDULENT INDUCEMENT, INTERFERENCE WITH CONTRACT AND PROSPECTIVE ECONOMIC ADVANTAGE

128.     Plaintiffs reallege and incorporate, as if fully alleged herein, each of the allegations contained in the preceding paragraphs of this complaint, and further allege against Defendants, and each of them, as follows:

129.     Plaintiffs are informed and believe, and on that basis allege, that, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, Defendants have knowingly, intentionally and with specific intent to do so, attempted to monopolize the Independents Ad Rep Market.

130.     Plaintiffs are informed and believe, and on that basis allege, that Defendants have attempted to monopolize the Independents Ad Rep Market by the means and the overt acts set forth above, including their combination and conspiracy, predatory allocations and pricing, anticompetitive mergers, and their knowing and intentional interference with Plaintiffs' host, customer and potential host and customer relationships.

131.     As a direct and proximate result of Defendants' illegal, anti-competitive attempts to monopolize the Independents Ad Rep Market, Plaintiffs have suffered serious injury to their business and property.  Accordingly, Plaintiffs are entitled to treble damages and costs of suit, including reasonable attorneys' fees, pursuant to Section 4 of the Clayton Act, and a preliminary and permanent injunction restraining Defendants from continuing to violate Section 2 of the Sherman Act, 15 USC § 2, as alleged above.

## **FOURTH CLAIM FOR RELIEF**

**(Monopolization of the Independents Ad Rep Market in Violation of Section 2 of the Sherman Act)**

132.     Plaintiffs reallege and incorporate, as if fully alleged herein, each of the allegations contained in the preceding paragraphs of this complaint, and further allege against Defendants, and each of them, as follows:

133.     As a result of the acts hereinabove alleged, Defendants have in fact monopolized and secured monopoly power in the Independents Ad Rep Market by virtue of their achieving approximately a 95% market share and the ability to exclude competition and set prices in this market, in violation of Section 2 of the Sherman Act.

134.     As a direct and proximate result of Defendants' illegal, anti-competitive monopolization of the Independents Ad Rep Market, Plaintiffs have suffered serious injury to their business and property.

30

Accordingly, Plaintiffs are entitled to treble damages and costs of suit, including reasonable attorneys' fees, pursuant to Section 4 of the Clayton Act, and a preliminary and permanent injunction restraining Defendants from continuing to violate Section 2 of the Sherman Act, 15 USC § 2, as alleged above.

## FIFTH CLAIM FOR RELIEF

**(Violation of Section 7 of the Clayton Act With Respect to the Independents Ad Rep Market)**

135.    Plaintiffs reallege and incorporate, as if fully alleged herein, each of the allegations contained in the preceding paragraphs of this complaint, and further allege against Defendants, and each of them, as follows.

136.    Each of the mergers and acquisitions hereinabove alleged have substantially lessened competition, restrained commerce, and tended to create a monopoly in the Independents Ad Rep Market in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

137.    As a direct and proximate result of Defendants' illegal, anti-competitive mergers and acquisitions in the Independents Ad Rep Market, Plaintiffs have suffered serious injury to their business and property. Accordingly, Plaintiffs are entitled to treble damages and costs of suit, including reasonable attorneys' fees, pursuant to Section 4 of the Clayton Act, and a preliminary and permanent injunction restraining Defendants from continuing to violate Section 2 of the Sherman Act, 15 USC § 2, as alleged above.

## SIXTH CLAIM FOR RELIEF

**(Attempting to Monopolize the Independent Spoken Word Syndication Market in Violation of Section 2 of the Sherman Act)**

138.    Plaintiffs reallege and incorporate, as if fully alleged herein, each of the allegations contained in the preceding paragraphs of this complaint, and further allege against Defendants, and each of them, as follows:

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT AND THE CLAYTON ACT, AND FOR FRAUDULENT INDUCEMENT, INTERFERENCE WITH CONTRACT AND PROSPECTIVE ECONOMIC ADVANTAGE

139. Plaintiffs are informed and believe, and on that basis allege, that, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, Defendants have knowingly, intentionally and with specific intent to do so, attempted to monopolize the Independent Spoken Word Syndication Market.

140. Plaintiffs are informed and believe, and on that basis allege, that Defendants have attempted to monopolize the Independent Spoken Word Syndication Market by the means and the overt acts set forth above, including their combination and conspiracy, predatory allocations and pricing, anticompetitive mergers, and their knowing and intentional interference with Plaintiffs' host and customer, and potential host and customer, relationships.

141. As a direct and proximate result of Defendants' illegal, anti-competitive attempts to monopolize the Independent Spoken Word Syndication Market, Plaintiffs have suffered serious injury to their business and property. Accordingly, Plaintiffs are entitled to treble damages and costs of suit, including reasonable attorneys' fees, pursuant to Section 4 of the Clayton Act, and a preliminary and permanent injunction restraining Defendants from continuing to violate Section 2 of the Sherman Act, 15 USC § 2, as alleged above.

## SEVENTH CLAIM FOR RELIEF

### (Conspiracy to Monopolize the Independent Spoken Word Syndication Market in Violation of Section 2 of the Sherman Act)

142. Plaintiffs reallege and incorporate, as if fully alleged herein, each of the allegations contained in the preceding paragraphs of this complaint, and further allege against Defendants, and each of them, as follows:

143. Plaintiffs are informed and believe, and on that basis allege, that, in violation of Section 2 of the Sherman Act, 15 U.S.C § 2, Defendants knowingly, intentionally and with specific intent to do so, conspired to monopolize the Independent Spoken Word Syndication Market.

144. Plaintiffs are informed and believe, and on that basis allege, that Defendants have effectuated their conspiracy to monopolize the Independent Spoken Word Syndication Market by the means and the overt acts hereinabove alleged.

145. Plaintiffs are informed and believe, and on that basis allege, that, as a direct and proximate result of Defendants' anti-competitive conduct, as alleged herein, Defendants have conspired to

32

control, and unless restrained and enjoined by the Court, have a substantial likelihood of controlling, close to the entirety of the Independents Ad Rep Market, and that this control, coupled with the illegal combination and conspiracy hereinabove alleged, will result in a dangerous likelihood that Defendants will monopolize the Independent Spoken Word Syndication Market.

146.    As a direct and proximate result of Defendants' illegal, anti-competitive attempts to monopolize the Independent Spoken Word Syndication Market, Plaintiffs have suffered serious injury to their business and property.  Accordingly, Plaintiffs are entitled to treble damages and costs of suit, including reasonable attorneys' fees, pursuant to Section 4 of the Clayton Act, and a preliminary and permanent injunction restraining Defendants from continuing to violate Section 2 of the Sherman Act, 15 USC § 2, as alleged above.

## EIGHTH CLAIM FOR RELIEF

### (Fraudulent Inducement)

147.    Plaintiffs reallege and incorporate, as if fully alleged herein, each of the allegations contained in the preceding paragraphs of this complaint, and further allege against Defendants, and each of them, as follows:

148.    As Plaintiffs have more particularly alleged hereinabove, Plaintiffs are informed and believe, and on that basis allege, that the Dial Group has represented to Plaintiffs first that the Dial Group would not engage in Spoken Word Syndication to avoid conflicts of interest in serving as Plaintiffs' advertising sales representative, and then that the Dial Group would not engage in any such programming beyond certain specific exceptions identified in December of 2008.

149.    The Dial Group has also expressly and/or impliedly represented to Plaintiffs that the Dial Group had sold advertising on Plaintiffs' behalf for the amounts specified by the Dial Group on an order by order basis.

150.    Plaintiffs are informed and believe, and on that basis allege, that either such representations were not true at the time they were made, or that, at the time such representations were made, the Dial Group did not intend to comply with such representations for the duration of the Dial Group's representation of Plaintiffs.

151.    Plaintiffs are informed and believe, and on that basis allege, that such representations were made for the purpose of: inducing Plaintiffs: (i) to contract exclusively with the Dial Group, on a

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT AND THE CLAYTON ACT, AND FOR FRAUDULENT INDUCEMENT, INTERFERENCE WITH CONTRACT AND PROSPECTIVE ECONOMIC ADVANTAGE

long term basis, for sales representation within the Independents Ad Rep Market, rather than diversify and divide Plaintiffs' substantial ad rep business among other sales rep companies in the Independents Ad Rep Market, and thus reduce the exposure of both Plaintiffs and other potential ad rep service providers to the predatory tactics ultimately shown by the Dial Group; and (ii) to fail to question various terms and conditions of Plaintiffs' engagement of the Dial Group that did not create issues or concerns for Plaintiffs based upon the representations, inducements, promises and assurances of the Dial Group, as hereinabove alleged.

152. Plaintiffs reasonably relied on said representations based upon Plaintiffs' information and belief at the time that such representations were made.

153. Plaintiffs are informed and believe, and on that basis allege, that the Defendants, through continued wrongful misrepresentations to the Plaintiffs, as hereinabove alleged, have wrongfully, knowingly and intentionally acted, and continue to act, to procure an unfair advantage in the nature and terms of the business relationships between Plaintiffs and the Defendants which would not have posed issues had such representations on the part of the Dial Group been true, and, by such actions, have secured Plaintiffs' business, and the terms of such business, under false pretenses, as part of a device and scheme to eliminate, over time, the ability of Plaintiffs to go elsewhere for viable ad rep services within the Independents Ad Rep Market.

154. As a direct and proximate result of Defendants' wrongful acts, as hereinabove alleged, Plaintiffs have suffered serious injury to their business and property.

155. Plaintiffs are entitled to, and should be awarded, all resulting damages proximately caused by Defendants' wrongful actions, as hereinabove alleged.

156. Plaintiffs are informed and believe, and on that basis allege, that, in committing the acts alleged herein, the Defendants, and each of them, acted with malice, fraud and oppression. Accordingly, Plaintiffs are entitled to, and should be awarded, punitive and exemplary damages against each of the Defendants, in sufficient amounts in relation to the net worths and annual incomes of each Defendant to ensure that such Defendant will not engage in similar conduct in the future.

## NINTH CLAIM FOR RELIEF

### (Interference With Prospective Economic Advantage)

34

157. Plaintiffs reallege and incorporate, as if fully alleged herein, each of the allegations contained in the preceding paragraphs of this complaint, and further allege against Defendants, and each of them, as follows:

158. Plaintiffs have and/or had valuable prospective economic relationships and business opportunities with hosts, and/or potential hosts, and with radio station affiliates and/or prospective affiliates for Plaintiffs' programming ("**Plaintiffs' Business Relationships**"), from which Plaintiffs derived economic gain, and/or from which Plaintiffs had a reasonable expectancy of deriving future economic gain, or which contained a probability of future benefit to Plaintiffs, and Defendants were and are aware of these relationships.

159. Plaintiffs are informed and believe, and on that basis allege, that the Defendants, through the wrongful acts of the Defendants as hereinabove alleged, have wrongfully, knowingly and intentionally acted and continue to act to interfere with and destroy or harm Plaintiffs' Business Relationships.

160. Defendants' wrongful acts, as hereinabove alleged, have actually interfered with and disrupted Plaintiffs' Business Relationships, and the actions of the Defendants, as hereinabove alleged, have been a substantial factor in causing harm to Plaintiffs through the loss of prospective economic advantage.

161. Plaintiffs are entitled to, and should be awarded, all resulting damages proximately caused by Defendants' wrongful actions, as hereinabove alleged, including without limitation monetary loss from: (i) interference with and damage to Plaintiffs' relationships with their hosts and customers and prospective hosts and customers; (ii) loss of sales and profits therefrom; (iii) loss of market share and business opportunities for Plaintiffs' programming; (iv) harm to Plaintiffs' reputation and goodwill; and (v) such other losses as may be duly established by Plaintiffs in the course of this Action.

162. Plaintiffs are informed and believe, and on that basis allege, that, in committing the acts alleged herein, the Defendants, and each of them, acted with malice, fraud and oppression. Accordingly, Plaintiffs are entitled to, and should be awarded, punitive and exemplary damages against each of the Defendants, in sufficient amounts in relation to the net worths and annual incomes of each Defendant to ensure that such Defendant will not engage in similar conduct in the future.

163. Plaintiffs are further entitled to, and should be awarded, a preliminary and permanent injunction preventing the Defendants from committing the wrongful acts hereinabove alleged in the future.

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT AND THE CLAYTON ACT, AND FOR FRAUDULENT INDUCEMENT, INTERFERENCE WITH CONTRACT AND PROSPECTIVE ECONOMIC ADVANTAGE

# **TENTH CLAIM FOR RELIEF**

## **(Interference with Contract)**

164.    Plaintiffs reallege and incorporate, as if fully alleged herein, each of the allegations contained in the preceding paragraphs of this complaint, and further allege against Defendants, and each of them, as follows.

165.    Plaintiffs have and/or had valuable contract rights with hosts and radio station affiliates from which Plaintiffs derived economic gain, and/or from which Plaintiffs have and/or had a reasonable expectancy of deriving future economic gain, or which contained probability of future benefit to Plaintiffs ("**Plaintiffs' Contract Rights**"), and Defendants were and are aware of the existence of Plaintiffs' Contract Rights.

166.    Plaintiffs are informed and believe, and on that basis allege, that the Defendants, through the wrongful acts of the Defendants as hereinabove alleged, have wrongfully, knowingly and intentionally acted and continue to act to interfere with and destroy or harm Plaintiffs' Contract Rights.

167.    Defendants' wrongful acts, as hereinabove alleged, have actually interfered with and disrupted Plaintiffs' Contract Rights, and the actions of the Defendants, as hereinabove alleged, have been a substantial factor in causing harm to Plaintiffs.

168.    Plaintiffs are entitled to, and should be awarded, all resulting damages proximately caused by Defendants' wrongful actions, as hereinabove alleged, including without limitation monetary loss from: (i) interference with and damage to Plaintiffs' relationships with their hosts and customers under contract with Plaintiffs; (ii) loss of sales and profits therefrom; (iii) loss of market share and business opportunities for Plaintiffs' programming; (iv) harm to Plaintiffs' reputation and goodwill; and (v) such other losses proximately caused by such wrongful conduct on the part of the Defendants as may be duly established by Plaintiffs in the course of this Action.

169.    Plaintiffs are informed and believe, and on that basis allege, that, in committing the acts alleged herein, the Defendants, and each of them, acted with malice, fraud and oppression. Accordingly, Plaintiffs are entitled to, and should be awarded, punitive and exemplary damages against each of the Defendants, in sufficient amounts in relation to the net worths and annual incomes of each Defendant to ensure that such Defendant will not engage in similar conduct in the future.

170.    Plaintiffs are further entitled to, and should be awarded, a preliminary and permanent injunction preventing the Defendants from committing the wrongful acts hereinabove alleged in the future.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that Plaintiffs be granted the following relief against the Defendants, and each of them, as their responsibilities are determined, for the unlawful, wrongful and improper actions of the Defendants as hereinabove alleged, and/or as otherwise established in this Action:

1.    That the acts of Defendants, as hereinabove alleged, be adjudged and decreed to be in violation of Sections 1 and 2 of the Sherman Act, Section 7 of the Clayton Act, and other relevant laws;

2.    That Plaintiffs recover all damages, as provided by law, determined to have been sustained as to each of them, in accordance with the antitrust laws, and that judgment be entered against Defendants and on behalf of Plaintiffs;

3.    That Plaintiffs recover all other damages under all other cause of action determined to have been sustained as to each Plaintiff;

4.    For a disgorgement of profits and restitution by Defendants, and each of them.

5.    For exemplary and punitive damages against each Defendant, in sufficient amounts in relation to the net worth and annual incomes of each such Defendant to dissuade such Defendant from engaging in future wrongful conduct of the nature hereinabove alleged;

6.    For divestiture of the assets illegally acquired by the Dial Group in the Independents Ad Rep Market and the Independent Spoken Word Syndication Market;

7.    For preliminary and permanent injunctive relief prohibiting the Defendants, and each of them, from further commission of the wrongful acts hereinabove alleged, or from taking any actions to retaliate against, or otherwise damage, Plaintiffs, or any of them;

8.    That Plaintiffs recover all of their costs of suit incurred in connection with this Action, including without limitation attorneys' fees, as provided by law; and

9.    For such other and further relief as is just under the circumstances.

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT AND THE CLAYTON ACT, AND FOR FRAUDULENT INDUCEMENT, INTERFERENCE WITH CONTRACT AND PROSPECTIVE ECONOMIC ADVANTAGE

7. For preliminary and permanent injunctive relief prohibiting the Defendants, and each of them, from further commission of the wrongful acts hereinabove alleged, or from taking any actions to retaliate against, or otherwise damage, Plaintiffs, or any of them;

8. That Plaintiffs recover all of their costs of suit incurred in connection with this Action, including without limitation attorneys' fees, as provided by law; and

9. For such other and further relief as is just under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues so triable.

Dated: August **27**, 2012

By: _____

Ronald H. Severaid, SBN 78923
Carter Glahn, SBN 242378
SEVERAID & GLAHN, PC
1787 Tribute Rd. Suite D
Sacramento, CA 95815
Telephone: (916) 929-8383
Facsimile: (916) 925-4763

*Attorneys for Plaintiffs*

38

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT AND THE CLAYTON ACT, AND FOR FRAUDULENT INDUCEMENT, INTERFERENCE WITH CONTRACT AND PROSPECTIVE ECONOMIC ADVANTAGE